## GERALD HARTWELL v. PROGRESSIVE TRANSPORTATION COMPANY, INC.[1]

December 18, 1936.

No. 31,046.

[1]Reported in 270 N. W. 570.

*Safford, Putnam, Campbell & Levitt* and *Sam Abramson,* for appellant.

*William H. Freeman* and *J. F. Boyles,* for respondent.

JULIUS J. OLSON, JUSTICE.

This action was brought by Percy L. Hartwell, as father of his minor son Gerald, who, having reached majority prior to time of trial, was substituted in his own right as plaintiff. But the printed record and briefs of counsel bear the original title. To avoid confusion, we think it appropriate that the title be here amended so as to conform with the order of the trial court; hence we shall refer to Gerald as plaintiff.

In this, a truck collision case, plaintiff met with an adverse verdict. The court denied his motion for new trial, and the appeal is from that order.

The case appears to have been tried with care and in a thoroughly professional manner. As such, the issues for review here are limited and the lines sharply drawn.

The facts may be summarized thus: The accident happened upon state trunk highway No. 65, approximately one mile south of Owatonna. To the south of the place of accident is a hill sloping northerly, and beyond this is another with its slope in the opposite direction. As the road is constructed, both slopes are gradual, uni-

form, and free from bumps or depressions. There is a gradual rise to the north as one drives along from the lowest point between the two hills. A plat introduced in evidence by plaintiff is very helpful in that it clarifies the physical facts and the testimony presented to the triers of fact. The highway is paved 18 feet in width and on each side is a shoulder of earth and gravel about 6 feet in width. The shoulder slopes toward the ditch about half of its width. At the time in question, during the early morning hours (about 4:30 o'clock) of April 3, 1935, the shoulders were rather soft due to seasonal changes. Defendant's truck had been driven northerly upon this highway and had gone up the northerly hill approximately 320 feet from the lowest point between the crest of the two hills when the motor suddenly stopped. The driver tried to start the motor but soon found that this could not be accomplished as the gasolene tank was found to be empty. The truck being heavily loaded and of large dimensions (seven feet ten inches in width and considerably higher than wide), the driver and his assistant, who sat immediately to his right, concluded at once to back the truck by means of gravity, that being the only means available, so as to get the vehicle onto the easterly shoulder as far as possible, thus providing more adequate space upon the highway for passing traffic. The driver's helper opened the door to his right and "was standing on the running board looking back and telling me which way to back so I wouldn't go off too far." The ditch on their right was rather deep and the shoulder soft. This backing operation consumed, so these men estimated, approximately two minutes of time. Their truck was equipped with flares. Being experienced drivers, they had planned to place such upon the highway, but before they could get out of the cab to accomplish this purpose the truck driven by them was suddenly and violently struck from the rear by plaintiff's truck, which also was traveling from the south. Plaintiff was badly injured in the collision, and to recover for such injuries this action was brought, with the result already stated.

Plaintiff in his own behalf testified that he sat in his cab to the left and was doing the driving. Next to him was one Sellon, and to the extreme right was Stevenson. It will thus be observed that

the three men occupied the same seat. Speaking of atmospheric conditions, he said: "It was pretty dark right then," the "sky was clear," but "it was kind of hazy right in the hollow." This haze was below the crest of the hill down which he had proceeded immediately prior to the accident. After reaching the bottom of the incline from the south and upon the rising slope of the next hill or incline to the north "a little north of the hollow—just up on the grade a little bit—I seen an object. It looked pretty big at the time." When this object was discovered it was "I should judge 15 to 30 feet away. I swerved right out quick—to get by it." But the collision followed almost instantly, and the resulting harm was done. He further testified that it looked to him that "the front end [of defendant's truck] was headed northeast and the back end was headed southwest at an angle." The southwesterly corner of the truck "looked to me like it was a foot to two feet over the [center] line—the corner of the box." He "didn't see any lights." As he "approached, up right real close to it, it [defendant's truck] seemed like it was coming into me all the time * * * backwards."

The truck driven by plaintiff was practically new, provided with good lights and efficient brakes. It was in good condition in every respect. The pavement was dry. Plaintiff estimated his speed at 30 to 35 miles per hour.

■ At the outset we are faced with defendant's contention that its motion for a directed verdict should have been granted; hence that if its position in this respect is well taken the errors complained of by plaintiff are unavailing. Several cases are cited to sustain that view. Our attention is directed to the map (plaintiff's exhibit A) which very forcibly tends to sustain defendant's claims. From this map it is apparent that the bottom of the hollow was at least 300 feet to the south of where the collision took place. There is a slight rise of 3.24 inches in the first 50 feet to the north of the low point of the hollow. From then on to the point of collision the upward grade is regular, symmetrical, and uniform. It would therefore seem that if plaintiff had exercised the diligence of the ordinarily prudent person, as was his duty, and if the truck he was driving came up to statutory requirements in respect of lights, it is indeed

difficult to find as a fact that this plaintiff was in the exercise of due care. If he had kept a lookout, as was his duty for his own protection, he could not help seeing this large cream-colored truck ahead of him in time to avoid this unfortunate accident. This is particularly significant in view of the rear red lights and bright clearance lights functioning upon defendant's truck. There were six lights at the rear of defendant's truck. The two clearance lights were still burning after the impact, as also was one of the red lights, there being three in a cluster toward the lower part of the rear end, the other two having been smashed by the impact. The rear red brake light was also smashed.

What was said in Orrvar v. Morgan, 189 Minn. 306, 309, 249 N. W. 42, 43, seems quite appropriate here: "If his testimony is true, then he was traveling at a rate of speed that would make it impossible to stop or turn his car within the space illuminated by his headlights." The cases are there adequately discussed, and no attempt to discuss them will be made here. They are easily available.

The alleged "haze" to which plaintiff and Sellon referred was not observed by anyone else. Several witnesses, unimpeached and wholly free from any interest in the outcome, observed no such condition. Plaintiff's brother, also a truck driver, came upon the scene shortly after the accident and experienced no difficulty in observing the two trucks (plaintiff's and defendant's) when he reached the crest of the southerly hill many hundred feet (using the map, plaintiff's exhibit A, the distance is not far from 1,300 feet) south of the place of accident. Also, there is considerable testimony that plaintiff had an odor of liquor on his breath and that there was similar odor in plaintiff's cab. This testimony was, however, contradicted by plaintiff and Sellon, also by the doctor who treated both professionally shortly after the accident. But if it be granted that plaintiff's contributory negligence was for the jury, still we cannot reverse unless the requested instruction (hereafter referred to) was proper and a denial to give it erroneous. To this we now direct our attention.

■ After the parties rested counsel and the court discussed in chambers what the charge of the court should include. The only instruction requested by plaintiff and denied by the court was the so-called "flare" statute. L. 1933, c. 252 (3 Mason Minn. St. 1934 Supp. § 2720-54½), which reads:

"An act providing for precautions to be taken by motor trucks and motor busses *when parked* on a trunk highway. Be it enacted by the Legislature of the State of Minnesota:

"Section 1. **Parked motor busses and trucks to give warning signals.**—Whenever any motor truck or motor bus is *left standing* upon a trunk highway for any reason, the operator of such truck or bus shall use due care to warn travelers of the danger thereof, and in addition thereto in the nighttime or in the daytime when visibility is obscured, the operator of such motor truck or motor bus, in addition thereto, shall cause to be placed at least 50 feet from each end thereof a lighted red fuse similar to fuses used by railroad companies, and in daylight when visibility is not obscured, shall cause red flags to be placed at least 50 feet from each end thereof, and each motor truck or motor bus shall carry with it as a part of its equipment the facilities for carrying out the provisions of this section." (Italics supplied.)

The court was of opinion that this statute was not applicable, and plaintiff duly excepted. Instead the court charged the jury on this phase in the language of 1 Mason Minn. St. 1927, § 2720-24(a, c) as follows:

"No person shall park or leave standing any vehicle, whether attended or unattended, upon the paved or improved or main traveled portion of any highway, outside of a municipality, when it is practicable to park or leave such vehicle standing off of the paved or improved or main traveled portion of such highway; provided, in no event shall any person leave standing any vehicle, upon any highway unless a clear and unobstructed width of not less than fifteen feet upon the main traveled portion of said highway opposite such standing vehicle shall be left for free passage of other vehicles thereon, nor unless a clear view of such vehicle may be

obtained from a distance of 200 feet in each direction upon such highway.

"The section I have just read to you, the last one, the provisions of this section shall not apply to the driver of any vehicle which is disabled while on the paved or improved or main traveled portion of a highway in such manner and to such extent that it is impossible to avoid stopping and temporarily leaving such vehicle in such position."

The record leaves no doubt that the question of whether defendant's truck was far enough to the east of the center line to leave a clear space of 15 feet to the west was one of fact and presented a jury issue. Plaintiff heavily relied upon a claimed violation of the clearance space provision thereof. Not even now is there any claim or suggestion that this section was or is inappropriate to plaintiff's cause. Clearly, defendant could not comply with both sections at the same moment. In view of the width of defendant's truck, it seems clear that the 15-foot clearance statute must be complied with promptly. Upon the present record there can be no doubt that defendant's driver was in fact exercising reasonable diligence in making the decision he did and in proceeding to execute the same in the only manner then open and available. Also to be noted is the fact that plaintiff did not except to the giving of the quoted charge, nor is it now in any manner attacked.

Is the statute upon which plaintiff relies applicable to the facts here appearing? In other words, was defendant's truck "parked" or "left standing" on the highway? From the title of the act and its context it seems clear that the words "parked" and "left standing" mean the same thing. In Webster's New International Dictionary (2d) 1935, the words "park" and "parked" are defined to mean: *"To stop and keep* (a vehicle, esp. a motor vehicle) *standing for a time on a public way, or to leave temporarily on a public way* or in any open space, esp. in a space assigned for the occupancy of a number of automobiles. Statutes and ordinances placing restrictions on parking define the term variously. In some jurisdictions, keeping a vehicle standing with a driver in his place is called *live parking;* without a driver, *dead parking. A vehicle halted while*

*awaiting a traffic signal, or while allowing an occupant to alight or a waiting passenger to get aboard, is not usually regarded as a parked vehicle."* ` (Italics supplied.)

The decided cases that have defined the words "park" or "parked" seem in accord with the definition given by Webster. Thus, in Bruening v. Miller, 57 S. D. 58, 66, 67, 230 N. W. 754, 757-758, the South Dakota court said:

"Defendant's tractor stopped on the highway because of an accident. He at once repaired the float in the carburetor and set out to obtain gasoline with which to replace its motor power. It is not claimed that the threshing rig could have been moved from the highway in any other manner more quickly than that adopted by defendant, or that defendant consumed any unnecessary or unreasonable time either in repairing the carburetor, obtaining the gasoline, or returning to the rig. * * * Leaving the rig upon the highway under these circumstances was not 'parking' it in the sense in which that word is properly used. Kastler v. Tures, 191 Wis. 120, 210 N. W. 415. Long v. Steffen, 194 Wis. 179, 215 N. W. 892, 61 A. L. R. 1155."

In addition to the cases cited by the South Dakota court, we find that the Wisconsin court in a later case, Village of Wonewoc v. Taubert, 203 Wis. 73, 77-78, 233 N. W. 755, 756, 72 A. L. R. 224, said:

"The term 'parking,' as applied to automobiles and automobile traffic, has a well-defined meaning, understood by all automobile drivers to mean not only the voluntary act of leaving a car on the street unattended but also the stopping of a car on the highway though occupied and attended for a length of time inconsistent with the reasonable use of a street, considering the primary purpose for which streets exist."

In Newell Contracting Co. v. Berry, 223 Ala. 109, 110, 134 So. 870, 872, the court said:

" 'Parking' with reference to motor vehicles is a term used as meaning the permitting of such vehicles to remain standing on a public highway or street; the voluntary act of leaving a vehicle on

the highway when not in use. The term is well-known and understood, and to 'park' means something more than a mere temporary or momentary stoppage on the road for a necessary purpose."

Other cases sustaining the views hereinbefore quoted are Townsend v. Jaloff, 124 Or. 644, 264 P. 349, 351; Martin v. Oregon Stages, Inc. 129 Or. 435, 277 P. 291, 294.

Upon the facts here appearing, we do not think defendant's truck was "parked" or "left standing" within the meaning of the statute upon which plaintiff relies. According to plaintiff's own testimony, it was in motion when the collision occurred. According to defendant's claim, it had just stopped preparatory to its occupants' getting out of the cab. In either case it was obviously neither "parked" nor "left standing."

■ The court also instructed the jury:

"The fact that defendant's truck ran out of gas and if that was negligence, it was not such as contributed directly or proximately to the collision, and is not to be considered by you as an act of negligence contributing to this collision in this case."

No objection was made or exception taken to this portion of the charge at the trial. Plaintiff does not claim that the court's charge was wrong in the abstract. His claim is that as he had made no claim that running out of gas was made a basis for any charge of negligence in his complaint, and as no evidence had been introduced by him in support of such claim, therefore the charge "was gratuitous, not related to any issue in the case," and, with the other portions of the charge hereinbefore discussed, "the effect was cumulative and prejudicial." The fact that defendant's driver had failed to provide an adequate supply of gas was brought into the case. Whatever such oversight amounted to was before the jury as an undisputed item of evidence. If this oversight had not occurred then there would have been no stalling of defendant's truck, hence, in all probability, no accident. To clarify the real issues from such extraneous matters was undoubtedly what the court sought to accomplish. To say that by so doing the court erred and

that such instruction was prejudicial is going too far afield in hunting for something obviously nonexistent.

Order affirmed.

MR. JUSTICE STONE took no part in the consideration or decision of this case.

